## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA STAGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 3:2006-101 |
| | ) |
| BEVERLY HEALTH AND | ) |
| REHABILITATION SERVICES, INC. | ) |
| d/b/a BEVERLY HEALTHCARE- | ) |
| RICHLAND and BEVERLY | ) |
| ENTERPRISES-PENNSYLVANIA, | ) |
| INC., d/b/a BEVERLY HEALTHCARE- | ) JUDGE GIBSON |
| RICHLAND, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### SYNOPSIS

This matter comes before the Court on a Motion for Summary Judgment filed by the Defendants, Beverly Health and Rehabilitation Services, Inc., d/b/a Beverly Healthcare-Richland and Beverly Enterprises-Pennsylvania, Inc., d/b/a Beverly Healthcare-Richland (collectively referred to as "Beverly"), pursuant to Federal Rule of Civil Procedure 56. *See* Document No. 22. The Plaintiff, Barbara Stager ("Stager"), opposes Beverly's Motion for Summary Judgment. *See* Document No. 25. This controversy arises out of Beverly's decision to eliminate Stager's position shortly before she was due to give birth. For the reasons that follow, the Court will deny Beverly's Motion for Summary Judgment.

1

## BACKGROUND

Beverly maintains its Richland facility in Johnstown, Pennsylvania, where it provides long-term care for its residents. Document Nos. 24 & 27, ¶ 1. Prior to September 2003, Lisa Middleton ("Middleton"), a nurse, performed both admissions and restorative nursing duties at the facility. *Id.* Her admissions duties included providing tours of the facility, completing admissions forms, and overseeing the transfer of patients to the facility. *Id.*, ¶ 2. Her restorative nursing duties included working with patients who had been discharged from rehabilitation services in order to ensure that they could maintain their prior levels of functioning. *Id.*, ¶ 3. State regulations required facilities such as the Richland facility to provide restorative nursing care, which could only be performed by a licensed nurse. *Id.*, ¶ 4. John Poltrack ("Poltrack") was the Executive Director of the facility. *Id.*, ¶ 5. Middleton reported directly to Poltrack. *Id.* The facility had the capacity to house 97 residents. *Id.*, ¶ 8. On average, approximately 94 residents were housed at the Richland facility at a given time. *Id.*

Maple Winds is a long-term care facility located in Portage, Pennsylvania. Document No. 26, ¶ 180. It is about 15 miles away from the Richland facility, and it has the capacity to house 50 residents. *Id.* On September 11, 2003, Maple Winds became certified to participate in the Medicare program. *Id.*, ¶ 181. Nevertheless, Maple Winds was not approved to participate in Pennsylvania's Medicaid program. *Id.*, ¶ 182.

Prior to the fall of 2003, Beverly did not maintain an employee at the Richland facility who focused primarily on outside sales and marketing. Document Nos. 24 & 27, ¶ 7. Beverly ultimately decided to create a Community Relations Representative ("CRR") position in September 2003. *Id.*, ¶ 9. Stager was hired to fill this position, and she commenced her employment at the facility on

2

September 29, 2003. *Id.*, ¶ 10. Stager has a bachelor's degree in communications and business management, as well as experience in sales, marketing and admissions. Document No. 26, ¶ 3. She worked 30 hours per week for an annual salary of $35,000.00. *Id.*, ¶ 4. Under this arrangement, she was considered to be a full-time Beverly employee. *Id.* Stager's duties included sales, marketing and admissions. Document Nos. 24 & 27, ¶ 14. Her admissions duties were shared with Middleton, who became the Director of Social Services when Stager was hired. *Id.* The restorative nursing duties which had previously been performed by Middleton were assumed by Roxanne Brazil ("Brazil"), who was the Assistant Director of Nursing. *Id.*, ¶ 15.

When Stager commenced her employment with Beverly, she reported directly to Erin McAndrew ("McAndrew"), who was the Senior Community Relations Representative ("SCRR"). *Id.*, ¶ 16. It was McAndrew who made the decision to hire Stager. Document No. 26, ¶ 5. Nonetheless, McAndrew did not work with Stager at the Richland facility. *Id.*, ¶ 6. Stager and McAndrew saw each other on only three occasions. *Id.* One such occasion was when Stager was interviewed for the CRR position, and another such occasion was when the two of them met to set up Stager's office. *Id.* Around February or March of 2004, Terri George ("George") replaced McAndrew as the SCRR responsible for supervising Stager, but Stager was not informed of this change. *Id.*, ¶ 7. The SCRR (McAndrew or George) reported to Patricia Bartlett ("Bartlett"), who was the Regional Director of Business Development. Document Nos. 24 & 27, ¶ 16. Stager indirectly reported to Poltrack. *Id.*, ¶ 17. Although Beverly employed CRRs in its other facilities, Stager was the only CRR who had ever been employed at the Richland facility. Document No. 26, ¶ 9.

On October 12, 2003, Stager informed Poltrack and McAndrew that she was pregnant. *Id.*, ¶

3

11. McAndrew asked Stager whether she intended to return to work after having her baby, and Stager responded in the affirmative. *Id.*, ¶ 12. During the early portion of 2004, Denise Curry ("Curry"), who was the Director of Operations, began to evaluate the allocation of employees who performed sales duties at various Beverly facilities in Pennsylvania. Document Nos. 24 & 27, ¶ 19. Bartlett, McAndrew and George also participated in this process. *Id.* Brazil, who had been performing restorative nursing duties, did not have time to continue performing such duties in addition to her duties as the Assistant Director of Nursing. *Id.*, ¶ 22.

McAndrew and Poltrack approved a change to Stager's weekly schedule in order to make it more convenient for her to attend an "Aqua Mom" class. *Id.*, ¶ 35. Stager was provided with a summary of her benefits on January 22, 2004. *Id.*, ¶ 37. During the early part of March 2004, Stager was directed to John Fink ("Fink"), who was Beverly's Regional Employment Labor Relations Manager. *Id.*, ¶ 38. Fink provided Stager with information about the Beverly policies that were relevant to her need for maternity leave. *Id.* Stager's anticipated due date was May 4, 2004. Document No. 26, ¶ 15. Because she had planned to return to work after giving birth, Stager paid a registration fee in March 2004 to reserve daycare space for her baby at the Greater Johnstown Christian Fellowship Early Education Department, which was located very close to the Richland facility. *Id.*, ¶¶ 17-18.

On April 16, 2004, George and Poltrack met with Stager and informed her that her CRR position was being eliminated. *Id.*, ¶¶ 73-75. This meeting was apparently the occasion on which Stager learned that George had replaced McAndrew as the SCRR. *Id.*, ¶ 35. George told Stager that her position was being eliminated because of the Richland facility's decreased need for marketing. *Id.*, ¶ 75. When Stager asked George and Poltrack whether her performance had been deficient, they indicated that there

4

were no problems related to her performance. *Id.*, ¶ 76. Stager gave birth to her baby on May 12, 2004, roughly one month after learning of her termination. *Id.*, ¶ 15.

In July 2004, Beverly internally advertised a vacancy for a newly created, full-time position at the Richland facility. Document Nos. 24 & 27, ¶ 26. The position included duties related to both admissions and restorative nursing. *Id.* Since she was not a licensed nurse, Stager did not meet the qualifications for the position. *Id.*, ¶ 27. Two licensed nurses, Diane Sharp Shaffer ("Shaffer") and Georgeanne McLaughlin ("McLaughlin"), submitted their applications. *Id.*, ¶ 28. Shaffer was ultimately chosen for the position. *Id.*, ¶ 29. At some later point in time, Shaffer resigned in order to accept a full-time position in a doctor's office. *Id.*, ¶ 30. She was replaced by Tammi Gordon ("Gordon"), who was also a licensed nurse. *Id.*

Stager filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") on August 24, 2004, alleging that Beverly had violated Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*] and the Pennsylvania Human Relations Act ("PHRA") [43 P.S. § 951 *et seq.*] by discharging her because of her pregnancy. Plaintiff's Exhibit 24, Document No. 28-5, pp. 7-8. The EEOC issued a right to sue letter on February 28, 2006. Plaintiff's Exhibit 28, Document No. 28-5, pp. 17-18. Stager commenced this action against Beverly on May 5, 2006, contending that Beverly had violated her rights under Title VII. Document No. 1. On June 15, 2006, the PHRA dismissed Stager's administrative complaint. Document No. 4, ¶ 2(d). Five days later, Stager amended her complaint in order to assert a claim under the PHRA. Document No. 4, ¶¶ 15-17. Beverly filed a Motion for Summary Judgment on June 15, 2007. This motion is currently pending before the Court and, hence, is the subject of this

memorandum opinion.

## **SUMMARY JUDGMENT STANDARDS**

> Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91 L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638 (3d Cir. 1993)]."

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## **JURISDICTION AND VENUE**

This Court has jurisdiction over Stager's Title VII claim pursuant to 28 U.S.C. § 1331, 28

U.S.C. § 1343(a)(4) and 42 U.S.C. § 2000e-5(f)(3). Supplemental jurisdiction over her PHRA claim

is predicated on 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

## DISCUSSION

### A. The Issue of Liability

Stager's claims arise under Title VII and the PHRA. Before proceeding to the merits of such claims, the Court must take note of a few preliminary points. Since this is an employment discrimination case in which no direct evidence of discrimination is presented, the United States Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the instant Motion for Summary Judgment. In an employment discrimination case such as this, the plaintiff must establish a prima facie case of forbidden discrimination (*i.e.*, show that he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination). *McDonnell Douglas*, 411 U.S. at 802. If a *prima facie* case is established, the defendant must articulate a legitimate, nondiscriminatory reason for treating the plaintiff in an adverse manner. *Id.* at 802-803. If the defendant articulates such a reason, the plaintiff must demonstrate that the reason given by the defendant for the plaintiff's treatment is merely a pretext for illegal employment discrimination. *Id.* at 804-805. Evidence that an employer's stated reasons for an adverse employment action are unworthy of credence is one form of circumstantial evidence that a plaintiff can use to establish the existence of intentional discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

The requirement that the plaintiff establish a *prima facie* case of unlawful discrimination "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), cert. denied,

7

515 U.S. 1159 (1995). A *prima facie* case raises an inference of discrimination because the courts presume that the challenged actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors." *Id.* Nevertheless, it must be remembered that the *McDonnell-Douglas-Burdine* framework "was never intended to be rigid, mechanized, or ritualistic." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978). This is especially true with respect to the plaintiff's need to establish a prima facie case. In *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit made it clear that "the elements of a prima facie case depend on the facts of the particular case[,]" and that "a prima facie case cannot be established on a one-size-fits-all basis." Thus, "the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003).

The *McDonnell Douglas-Burdine* framework does not apply in employment discrimination cases in which there is direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Direct evidence of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995). In cases in which direct evidence of discrimination is presented, there is no need for an "inference" of discrimination, since the discrimination itself is readily transparent. In this case, however, Stager has not presented direct evidence of discrimination. Therefore, her claims will be analyzed in accordance with the standards laid down in *McDonnell Douglas* and *Burdine*.

Title VII's anti-discrimination provision is codified at 42 U.S.C. § 2000e-2(a), which provides:

8

## § 2000e-2. Unlawful employment practices

**(a) Employer practices.** It shall be an unlawful employment practice for an employer--

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). Beverly does not dispute that, at all times relevant to this litigation, it was an "employer" under 42 U.S.C. § 2000e(b).[1] As a covered employer, Beverly was bound by Title VII's anti-discrimination provision.

The PHRA makes it an "unlawful discriminatory practice" for any covered employer "to bar or to discharge from employment" an individual because of his or her "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability[.]" 43 P.S. § 955(a). It is undisputed that Beverly was an "employer" within the meaning of 43 P.S. § 954(b). Consequently, Beverly was bound by the PHRA's anti-discrimination provision at the time of Stager's discharge.

The gravamen of Stager's case is that she was discharged because of her *pregnancy*. The Pennsylvania Supreme Court has consistently construed the PHRA's prohibition of *sex* discrimination to prohibit discrimination against *pregnant* women, even where such discrimination has not been

---

[1] The Court acknowledges that Beverly Healthcare-Richland, which was purchased by GGNSC Johnstown, LP, on April 1, 2006, is now known as Golden Living Center-Richland. Document No. 26, ¶ 206. The successor has apparently assumed Beverly's liabilities. *Id.* Nevertheless, the Court will continue to refer to the "employer" as Beverly, since that is the entity that employed (and discharged) Stager. *Id.*, ¶ 207.

9

targeted at *women* in a more general sense. *Cerra v. East Stroudsburg Area School District*, 299 A.2d 277, 280 (Pa. 1973)("In short, Mrs. Cerra and other pregnant women are singled out and placed in a class to their disadvantage. They are discharged from their employment on the basis of a physical condition peculiar to their sex. This is sex discrimination pure and simple."). Title VII was not originally construed in this manner. In *General Electric Co. v. Gilbert*, 429 U.S. 125, 145-146, 97 S.Ct. 401, 412-413, 50 L.Ed.2d 343, 360 (1976), the United States Supreme Court held that Title VII was not violated where a covered employer's disability-benefits plan failed to cover pregnancy-related disabilities. Speaking through Justice Rehnquist, the Supreme Court explained that Title VII's prohibition of *sex* discrimination did not prohibit discrimination on the basis of *pregnancy*. *Gilbert*, 429 U.S. at 139 ("For all that appears, pregnancy-related disabilities constitute an additional risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits, accruing to men and women alike, which results from the facially evenhanded inclusion of risks."). In the aftermath of *Gilbert*, the Pennsylvania courts continued to hold that pregnancy-based discrimination violated the PHRA, even though it did not violate Title VII. *Anderson v. Upper Bucks County Area Vocational Technical School*, 373 A.2d 126, 130 (Pa.Commw.Ct. 1977).

Displeased with the Supreme Court's decision in *Gilbert*, Congress responded in 1978 by enacting the Pregnancy Discrimination Act ("PDA"). Pub. L. No. 95-555, 92 Stat. 2076 (1978). The PDA, which is codified at 42 U.S.C. § 2000e(k), added the following language to Title VII's "Definitions" section:

(k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated

10

the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title [42 U.S.C. § 2000e-2(h)] shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k).[2] In light of this statutory amendment, discrimination on the basis of *pregnancy* constitutes *sex* discrimination within the meaning of Title VII's anti-discrimination provision. *Newport News Shipbuilding & Dry Dock Co. v. Equal Employment Opportunity Commission*, 462 U.S. 669, 684, 103 S.Ct. 2622, 2631, 77 L.Ed.2d 89, 103 (1983)("The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."). Thus, Title VII and the PHRA currently contain analogous prohibitions against pregnancy-based discrimination. As a general matter, the anti-discrimination provisions of the PHRA are typically construed to be coextensive with their federal counterparts unless the relevant statutory language of the PHRA indicates that a different construction is warranted. *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). There is no indication that the PHRA's application in this case differs from that of Title VII. Therefore, the Court's discussion about Stager's Title VII claim will also be dispositive of her PHRA claim.

The Civil Rights Act of 1991 added the following language, which is codified at 42 U.S.C. § 2000e-2(m), to Title VII:

**(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices.** Except as otherwise provided in this title [42 U.S.C. § 2000e *et seq.*], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor

---

[2]The Court has omitted language in the PDA concerning insurance benefits for abortion, since that language has no bearing on this case. 42 U.S.C. § 2000e(k).

for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m); Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075 (1991). In *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the Supreme Court held that a plaintiff need not present "direct evidence" of discrimination in order to obtain a "mixed-motive" instruction under § 2000e-2(m), and that a court may give such an instruction where the plaintiff has presented "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice." *Desert Palace*, 539 U.S. at 101, 123 S.Ct. 2148, 2155, 156 L.Ed.2d 84, 95-96 (internal quotation marks omitted). Since a showing that Stager's pregnancy (*i.e.*, her sex) was a motivating factor in Beverly's decision to discharge her would suffice to sustain a jury's finding of an "unlawful employment practice," such a showing will also be sufficient to defeat Beverly's Motion for Summary Judgment.[3] "After all, the summary judgment inquiry is inextricably linked with what a reasonable *jury* could or could not decide, which can only be determined by reference to *what* the jury may ultimately be asked to consider." *Vereen v. Woodland Hills School District*, 2008 WL 794451, at *19, 2008 U.S. Dist. LEXIS 23075, at *53 (W.D.Pa. March 24, 2008)(emphasis in original). Consequently, Stager can defeat Beverly's Motion for Summary Judgment by producing sufficient evidence to convince a reasonable

---

[3]Although not directly relevant to the Court's analysis at this stage, 42 U.S.C. § 2000e-5(g)(2)(B) provides a partial affirmative defense for an employer able to establish that it "would have taken the same action in the absence of the impermissible motivating factor[.]" Where the partial affirmative defense is established, a court may grant declaratory and injunctive relief, as well as attorney's fees and costs directly attributable to the pursuit of a claim under § 2000e-2(m), but may not award damages or issue an order requiring admission, reinstatement, hiring, promotion or payment. 42 U.S.C. § 2000e-5(g)(2)(B)(i)-(ii). The Court notes that Stager seeks injunctive relief, costs and attorney's fees, which could be obtained upon a showing of an "unlawful employment practice" even if Beverly were to succeed in establishing a partial affirmative defense under § 2000e-5(g)(2)(B). Document No. 4, ¶ 14.

12

jury that her pregnancy was either a *motivating* factor or a *determinative* factor in Beverly's decision to terminate her employment.[4] *Desert Palace*, 539 U.S. at 101, 123 S.Ct. 2148, 2155, 156 L.Ed.2d 84, 95-96; *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 220 (3d Cir. 2000).

---

[4] In *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 220 (3d Cir. 2000), the Court of Appeals for the Third Circuit held that § 2000e-2(m) did not alter the pre-existing distinction between "pretext" cases and so-called "mixed-motive" cases, and that plaintiffs proceeding under a "pretext" theory of discrimination were not relieved of their burden to show that the forbidden discriminatory criterion was a *determinative* (rather than merely a *motivating*) factor behind the employment practice alleged to be unlawful. Concluding that § 2000e-2(m) had overruled only the portion of Justice O'Connor's concurrence in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), holding that an employer could avoid a finding of liability by establishing that it would have made the same employment-related decision even if it had not considered the impermissible criterion, the Court of Appeals distinguished between "pretext" cases and "mixed-motive" cases by reference to Justice O'Connor's "direct evidence" requirement. *Watson*, 207 F.3d at 212-220. This reasoning was squarely rejected by the Supreme Court in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98, 123 S.Ct. 2148, 2153, 156 L.Ed.2d 84, 93 (2003)("Like the Court of Appeals, we see no need to address which of the opinions in *Price Waterhouse* is controlling: the third step of petitioner's argument is flawed, primarily because it is inconsistent with the text of § 2000e-2(m)."). Since "direct evidence" is *not* required in order for a plaintiff to obtain a "mixed-motive" jury instruction under § 2000e-2(m), it is now clear that § 2000e-2(m) is applicable to at least *some* (if not *all*) of the so-called "pretext" cases referenced by the Court of Appeals in *Watson* (i.e., cases in which no "direct evidence" of discrimination is presented). *Desert Palace* did not address the question of whether § 2000e-2(m) eradicated the distinction between "pretext" cases and "mixed-motive" cases, or whether it is applicable to "pretext" cases if such a distinction still exists. *Desert Palace*, 539 U.S. at 94, 123 S.Ct. 2148, 2151, 156 L.Ed.2d 84, 91 n. 1 ("This case does not require us to decide when, if ever, § 107 applies outside of the mixed-motive context."). Nevertheless, before *Desert Palace*, the Court of Appeals had assumed that these two categories of cases were mutually exclusive, using the "direct evidence" line of demarcation to distinguish between them. *Watson*, 207 F.3d at 218 ("By contrast, the term 'demonstrates' is not the most apt choice if the drafters wanted to describe, not just the cases in which the plaintiff offers 'direct' evidence of discriminatory animus, but also the great number of disparate treatment cases in which the plaintiff, proceeding under *McDonnell Douglas*, establishes the elements of a prima facie case and urges the factfinder to infer discriminatory animus from the employer's asserted failure to offer a credible alternative reason for the contested employment action."). It would make little sense for the Court to hold, in the aftermath of *Desert Palace*, that § 2000e-2(m) applies only where a plaintiff *concedes* that permissible factors (in addition to impermissible factors) influenced the challenged employment decision. The existence or nonexistence of an unlawful employment practice is not dependent upon the theory advanced by a plaintiff challenging that practice. *Quantum Chemical Corp. v. Toennies*, 47 S.W.3d 473, 478 (Tex. 2001)("Establishing an unlawful employment practice is, of course, the entire point of a plaintiff's suit, no matter how it is judicially classified."). An employment practice either does or does not violate Title VII when it *occurs*. The only logical reading of *Desert Palace* is that plaintiffs such as Stager, who have no "direct evidence" of discrimination, can still benefit from § 2000e-2(m)'s relaxed standard. Indeed, that was the *holding* in *Desert Palace*. If any Title VII discrimination cases are outside of § 2000e-2(m)'s scope, it is not clear how such cases should be identified. Prior to 2003, such cases were identified by reference to the "direct evidence" requirement, which has since been rejected by the Supreme Court as the applicable benchmark. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995)(distinguishing between "pretext" cases and "mixed-motive" cases by reference to whether "direct evidence" of discrimination was present).

In order to establish a *prima facie* case of discrimination under Title VII, as amended by the PDA, Stager must show that: (1) she was a member of the class of persons protected under Title VII and the PDA (i.e., she was pregnant); (2) Beverly was aware of her status as a statutorily protected person (i.e., Beverly knew that she was pregnant); (3) she was qualified for the CRR position that she held; (4) she was "discharged" within the meaning of § 2000e-2(a)(1); and (5) her discharge occurred under circumstances giving rise to an inference of pregnancy-based discrimination. *Geraci v. Moody-Tottrup International, Inc.*, 82 F.3d 578, 580-582 (3d Cir. 1996). There is no dispute as to the first four elements of Stager's *prima facie* case. Beverly does argue, however, that Stager cannot establish a *prima facie* case of discrimination because she cannot show that she was replaced by someone outside of the class of persons protected under Title VII and the PDA. Document No. 23, pp. 8-9. This argument is unavailing.

It is axiomatic that the elements of a *prima facie* case "must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." *Geraci*, 82 F.3d at 581. The critical question in this case does not concern the traits of the person who *replaced* Stager, since her position was eliminated. The traits of a replacement are often relevant to the more general question of whether a particular discharge has occurred under circumstances giving rise to an inference of discrimination, but such traits do not *themselves* constitute the *sine qua non* of an employment discrimination claim. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 438 (1996)("Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case."); *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 353 (3d

14

Cir. 1999)("Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from this class–which in the present context is presumably true of all but the most misogynistic employers–and does not establish that the employer did not fire the plaintiff on the basis of her protected status."); *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491, n. 4 (M.D.Pa. 2005)("We recognize that there may be some circumstances wherein a plaintiff can demonstrate an inference of discrimination even if he is replaced by an insignificantly younger individual."). In this case, the Court is convinced that Stager's discharge occurred under circumstances giving rise to an inference of pregnancy-based discrimination.

The CRR position held by Stager was eliminated just a few weeks before she was due to give birth. That fact alone, of course, is insufficient to create an inference of discrimination. *Foster v. Livingston-Wyoming Arc*, 2004 WL 1884485, at *3-4, 2004 U.S. Dist. LEXIS 17256, at *9-14 (W.D.N.Y. August 23, 2004). Nevertheless, the documentary evidence presented by Stager is more than sufficient to permit a reasonable jury to infer that discrimination has occurred. This same evidence is sufficient to cast doubt on the legitimate, nondiscriminatory reasons articulated by Beverly for Stager's discharge. In *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358 (3d Cir. 2008), a recent decision involving Title VII and the PDA, the Court of Appeals for the Third Circuit made the following observations:

[I]t is important to remember that the *prima facie* case and pretext inquiries often overlap. As our jurisprudence recognizes, evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.

*Doe*, 527 F.3d at 370 (emphasis in original). Accordingly, the Court's analysis of the documentary

evidence in this case will be relevant to both Stager's *prima facie* case and her arguments concerning pretext.

Under the Family and Medical Leave Act ("FMLA") [29 U.S.C. § 2601 *et seq.*], an eligible employee is "entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). Nevertheless, the FMLA defines the term "eligible employee" to include only those employees who have been employed "for at least 12 months by the employer with respect to whom leave is requested" and "for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). Since Stager had only been employed by Beverly for a little over six months at the time of her discharge, she was not an "eligible employee" within the meaning of the FMLA. Therefore, she had no statutory entitlement to leave. As the documentary evidence illustrates, however, there was some confusion about that among Beverly personnel.

During the first few months of her employment with Beverly, Stager apparently had Thursdays off. In an email to Poltrack and McAndrew dated December 16, 2003, Stager asked if she could miss work on Wednesday, January 14, 2004, and Friday, January 16, 2004, in order to go on a short vacation with her husband. Plaintiff's Exhibit 9, Document No. 28-4, p. 21. She indicated that she was willing to either work extra hours in order to make up the time or take the two days off without pay. *Id.* In response to Stager's inquiry, McAndrew emailed the following message to Poltrack:

if you are ok with these days I'm ok but she has to take them without pay.

I would like her to take over the admissions piece 100% after the New Year, I think it would decrease confusion and help Lisa a lot. Let me know what you think, it needs to work for you and your team. I will support your decision . . .

16

> I'm not convinced she will return after the baby?
> how about you?

*Id.* McAndrew's message indicates that she was both questioning whether Stager would continue working for Beverly after the birth of her child and contemplating what her duties would be upon her return from maternity leave.

On December 26, 2003, Stager sent an email to Poltrack and McAndrew asking for adjustments to her schedule. Plaintiff's Exhibit 34, Document No. 28-5, p. 29. She indicated that her initial vacation plans had been cancelled because of excessively high airfare. *Id.* Nonetheless, she asked if she could change her weekly day off from Thursday to Wednesday. *Id.* The purpose of the requested change was to make it more convenient for Stager to attend an "Aqua Mom" class. *Id.* The class was being held in close proximity to the Richland facility on Tuesday and Thursday evenings, and Stager expressed a preference to work on Thursdays rather than on Wednesdays in order to avoid the need to make an extra weekly trip from her home to the Richland area. *Id.* She also indicated that more conference calls and staff meetings had been held on Thursdays than on Wednesdays, thereby implying that it was in Beverly's best interest to accommodate her scheduling preference. Beverly apparently approved the requested change to Stager's weekly schedule. Document Nos. 24 & 27, ¶ 35.

As her due date approached, Stager became more anxious to learn about her leave options. In an email to Marcia Hartmann ("Hartmann") dated January 19, 2004, Stager stated that she had not been properly advised of Beverly's leave policies for salaried associates. Plaintiff's Exhibit 35, Document No. 28-5, p. 30. Stager apparently spoke with Marie Cottrell ("Cottrell") about the matter on March 1, 2004. Plaintiff's Exhibit 33, Document No. 28-5, p. 28. On that date, Stager emailed the following

17

message to Poltrack and McAndrew:

> I just spoke to Marie Cottrell in HR regarding the maternity leave. She said that I do not qualify for the Family and Medical Leave Act because I have not been employed by Beverly for 12 months. However, I do qualify for a Beverly Leave of Absence. Under this type of leave, I am able to take up to 12 weeks unpaid leave, will still need to exhaust my sick and vacation time, and I can return to whatever position is available. (will my position still be available?). There is also a difference pertaining to benefits, but I do not participate in the Beverly benefits plan. Also, no paperwork is required in advance–just a note from my doctor upon the birth or if he suggest that I stop working prior to the birth.
> Please let me know if you need any additional information from me regarding my intended leave of absence. Thanks!

*Id.* Later that evening, McAndrew forwarded Stager's message to Cottrell, indicating that Cottrell should call McAndrew "about this" because her "input" was needed on "something." *Id.* McAndrew also emailed the following inquiry to Curry:

> should we have her sign something that she agrees to return as a 40 hr employee? I can have Marie assist in composing the letter.

Plaintiff's Exhibit 11, Document No. 28-4, p. 23. Curry apparently never responded to this inquiry.

Shortly thereafter, Stager discussed her leave eligibility with Fink. In an email dated March 11, 2004, Stager sought an emailed verification from Fink that she was entitled to 480 hours of sick time and 8 days of vacation time to use during her Beverly Medical Leave. Plaintiff's Exhibit 19, Document No. 28-5, p. 1. She qualified her request by acknowledging that she was entitled to only 6 weeks of leave for a vaginal birth or 8 weeks of leave for a C-Section birth, unless unexpected complications were to arise. *Id.* Fink promptly responded by verifying that Stager's understanding was correct. *Id.*

On March 15, 2004, Bartlett sent an email to Curry indicating that she had discussed with

18

McAndrew and George several different staffing adjustments that needed to be made at various Beverly facilities. Plaintiff's Exhibit 15, Document No. 28-4, pp. 45-46. The relevant portion of the message stated as follows:

A Francine option: eliminating Barb Stager's–replace with CL to cover Fran's current territory ie Altoona; Indiana ect . . Erin is going to check her interest.

*Id.*, p. 46. Later that day, Curry responded with an email that stated:

The Francine option sounds ok to me, if we can get her. The email did not sound promising.

*Id.*, p. 45. Bartlett subsequently responded with a message stating, "Erin–GO for Fran!" *Id.* Viewed in the light most favorable to Stager, this documentary evidence suggests that Bartlett, Poltrack, McAndrew, George and Curry were hoping to eliminate Stager's position in order to create a position for somebody else.

During the following week, there were two new developments. Stager's doctor recommended that she work no more than four hours per day, and the person who Beverly personnel had been considering as a possible replacement for Stager indicated that she did not wish to take on the proposed assignment.[5] On March 23, 2004, McAndrew sent an email to Bartlett and Curry. Plaintiff's Exhibit 29, Document No. 28-5, p. 19. The message itself had no text, but the subject line read as follows:

---

[5]The record contains an email from McAndrew to Bartlett dated February 6, 2004, indicating that Stager wanted to work only 24 hours per week. Plaintiff's Exhibit 10, Document No. 28-4, p. 22. In that email, McAndrew stated that Stager was "extremely high maintenance." *Id.* It is not clear to the Court whether Stager's doctor recommended that Stager decrease her hours in early February, or whether the request referred to in McAndrew's email to Bartlett was unrelated to any relevant medical recommendations. When read in context, the emails suggest that the recommendation from Stager's doctor was not made until late March 2004.

Bad news Fran declined she's adopting an overseas toddler & on top of it B. Stager got a note from MD 4hrs day UGH!

*Id.* In an email to Fink dated March 25, 2004, Stager stated that, due to pregnancy-related complications, her doctor had recommended that she work no more than four hours per day. Plaintiff's Exhibit 32, Document No. 28-5, p. 27. Fink later responded with a message explaining how the FMLA's provisions concerning intermittent leave applied to her situation. *Id.*, p. 26. Fink's response clearly reflected an incorrect perception that Stager had a statutory entitlement to intermittent leave.

On the evening of March 25, 2004, McAndrew forwarded to Bartlett a copy of her previous inquiry to Curry as to whether Stager should be asked to sign a document expressing a willingness to work 40 hours per week after returning from maternity leave. Plaintiff's Exhibit 11, Document No. 28-4, p. 23. Bartlett subsequently emailed the following message to McAndrew:

Let's see if we can nip this. Be sure to cc me on this stuff. I can help you. Get some sleep and we'll deal with the princess tomorrow.

*Id.* When read within the context of the email chain, the word "princess" clearly referred to Stager. The emails appearing in this chain of messages contain the term "FMLA" in the subject line. *Id.*

That same evening, additional emails were exchanged. In a message to Poltrack and Curry, McAndrew explained that Stager had informed her of the doctor's recommendation. Plaintiff's Exhibit 32, Document No. 28-5, p. 26. The message also indicated that Beverly's corporate attorney was reviewing the requirements of the FMLA. *Id.* Bartlett responded by emailing the following message to McAndrew, Poltrack and Curry:

This associate does not qualify for FMLA. Erin, good follow-up. Let me know how

20

this shakes out after you speak with John.

*Id.* A carbon copy of this message was sent to Fink. *Id.*

On the morning of March 26, 2004, Fink sent an email to Bartlett indicating that he had mistakenly believed that Stager enjoyed a statutory entitlement to intermittent leave under the FMLA. *Id.*, p. 25. Fink had apparently been under the false impression that Stager had satisfied the FMLA's 12-month durational employment requirement. *Id.* He stated that he would contact Stager in order to explain that he had given her incorrect information. Bartlett sent a message responding as follows:

> Thanks John! This associate has been high maintenance . . just want to be sure we are all on the same page.

*Id.* Upon receipt of Bartlett's message, Fink emailed her the following reply:

> Just realized that she has only been on-board for 6 months and is ineligible for FML. Also, she would be entitled to a medical LOA in accordance with our policies and we can replace her. However, we may need to offer her reinstatement when she is able to return full-duty if we have not filled the position or there is a similar position available (which in this case there probably would not be one).
>
> I am going to speak with Erin shortly about this matter and will contact the associate today.

*Id.* This email chain indicates that Bartlett may have decided to eliminate Stager's position immediately after learning that Stager's doctor had recommended a decrease in her weekly work hours due to a pregnancy-related complication.

The record also contains an email chain containing messages sent during the final 48 hours of Stager's employment with Beverly. Plaintiff's Exhibit 18, Document No. 28-4, p. 1. On Wednesday,

April 14, 2004, Poltrack sent the following message to McAndrew:

Have you said anything to Barb about her job? She's making us nuts.

*Id.* McAndrew responded by sending the following message to Curry:

did you want to discuss with Terri and move on eliminating her position. I think you guys would benefit with a Clinical Liaison in that market . . .

*Id.* Curry then proceeded to email George, stating as follows:

Do you and John want to work on this together? Let's make the move and look for a CL. Thanks.

*Id.* The email chain ends with the following message, which was sent by George to both Poltrack and

Curry on the morning of Thursday, April 15, 2004:

I was planning to be at Richland tomorrow (Friday). John, can we talk in the a.m. and do the termination at noon as she ends the day? She'll want details about bonus, etc. Can we tell her anything or let her know we'll get back to her?

*Id.* An email outside of this chain was sent from George to Bartlett that same day. Plaintiff's Exhibit

16, Document No. 28-4, p. 47. It made the following inquiry:

John Poltrack and I will be terminating Barb Stager, CRR at Richland, tomorrow (Friday). I know she'll ask about her bonus(es) so does she meet the requirements for fourth and first quarters? Are we doing the generic "your services are no longer needed" or is there another reason we're giving her?

*Id.* George and Poltrack, of course, informed Stager that her position was being eliminated on Friday,

April 16, 2004. Plaintiff's Exhibit 21, Document No. 28-5, p. 3.

Based on this evidence, the Court has little trouble concluding that Stager has established a

prima facie case of pregnancy-based discrimination under Title VII and the PDA. As early as December 2003, McAndrew relayed to Poltrack her doubts as to whether Stager would return to work for Beverly after having her baby. Plaintiff's Exhibit 9, Document No. 28-4, p. 21. Shortly after Stager informed McAndrew and Poltrack of the details of her maternity leave options on March 1, 2004, McAndrew sought Cottrell's advice about the matter. Plaintiff's Exhibit 33, Document No. 28-5, p. 28. McAndrew also asked Curry whether Stager should be asked to sign an agreement obligating her to work 40 hours per week upon her return. Plaintiff's Exhibit 11, Document No. 28-4, p. 23. Stager, of course, had only been working 30 hours per week since the inception of her employment with Beverly. Having received no response from Curry, McAndrew forwarded this same inquiry to Bartlett on March 25, 2004, shortly after learning that Stager's doctor had recommended a decrease in her work hours because of a pregnancy-related complication. Plaintiff's Exhibit 11, Document No. 28-4, p. 23. Bartlett's response referred to Stager as "the princess." *Id.* One day later, in an email to Fink, Bartlett stated that Stager had been "high maintenance." Plaintiff's Exhibit 32, Document No. 28-5, p. 25. In this context, Beverly personnel decided to eliminate Stager's position even though the person whom they had hoped to hire (*i.e.*, "Francine") had declined to accept the new position. Moreover, Stager's position was eliminated just a few weeks before she was due to give birth. In ruling on a motion for summary judgment, a court may consider not only the timing of an adverse employment action, but also a broader array of evidence bearing on the question of whether unlawful discrimination has occurred. *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217, 232-233 (3d Cir. 2007). Based on the documentary evidence contained in the record, the Court concludes that Stager has established a *prima facie* case of discrimination under Title VII, as amended by the PDA, and under the PHRA.

23

Regardless of whether Stager's pregnancy actually motivated Beverly's decision to eliminate the CRR

position at the Richland facility, it is at least clear that a reasonable person could draw an inference of

illegal discrimination under the circumstances of this case.

The burden of production now shifts to Beverly to articulate a legitimate, nondiscriminatory

reason for Stager's discharge. At this point, it is worth recalling the precise nature of the burden placed

upon Beverly, which was described by the Supreme Court in *Burdine*:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of
> discrimination by producing evidence that the plaintiff was rejected, or someone else
> was preferred, for a legitimate, nondiscriminatory reason. The defendant need not
> persuade the court that it was actually motivated by the proffered reasons. See [*Board
> of Trustees of Keene State College v.*] *Sweeney*, [439 U.S. 24,] 25 (1978). It is sufficient
> if the defendant's evidence raises a genuine issue of fact as to whether it discriminated
> against the plaintiff. To accomplish this, the defendant must clearly set forth, through
> the introduction of admissible evidence, the reasons for the plaintiff's rejection. The
> explanation provided must be legally sufficient to justify a judgment for the defendant.
> If the defendant carries this burden of production, the presumption raised by the prima
> facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.
> Placing this burden of production on the defendant thus serves simultaneously to meet
> the plaintiff's prima facie case by presenting a legitimate reason for the action and to
> frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair
> opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should
> be evaluated by the extent to which it fulfills these functions.

*Burdine*, 450 U.S. at 254-256, 101 S.Ct. 1089, 1094-1095, 67 L.Ed.2d 207, 216-217 (footnotes

omitted). In evaluating Beverly's evidence for this purpose, the Court cannot engage in a "credibility

assessment." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 2748, 125 L.Ed.2d

407, 417 (1993). At this stage, Beverly bears the burden of *production* rather than the burden of

*persuasion*. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2106,

147 L.Ed.2d 105, 117 (2000).

Beverly offers legitimate, nondiscriminatory reasons for the elimination of Stager's CRR position. All of these reasons relate to a more generalized argument that it was not necessary for Beverly to employ a CRR at the Richland facility. Document No. 23, pp. 9-15. Beverly contends that the opening of Maple Winds, a potential competitor, had been its primary reason for creating a CRR position in Richland, and that such a position turned out to be unnecessary because Maple Winds ultimately failed to obtain its medical assistance certification. *Id.*, p. 9. In addition, Beverly argues that Stager was not qualified for the new position that was given to Shaffer (and later to Gordon), since she was not a licensed nurse.

Poltrack and George were deposed on December 5, 2006. Poltrack testified that, prior to the commencement of Stager's employment, there had been no CRR at the Richland facility. Plaintiff's Exhibit 4, Document No. 28-3, p. 7. He explained that he needed to have someone in the building who could perform both admissions and restorative nursing functions. *Id.*, p. 14. He further stated that it was not necessary for a CRR to be employed at the Richland facility, since the facility was almost always filled to capacity. *Id.* Poltrack's testimony is corroborated by that of George, who testified that the Richland facility had no need for a CRR to perform sales-related functions because the facility had always filled up without aggressive marketing efforts. Plaintiff's Exhibit 7, Document No. 28-4, p. 13.

McAndrew was deposed on January 5, 2007. On that occasion, she testified that the opening of Maple Winds had caused Beverly to be concerned about its market share in the Richland area. Plaintiff's Exhibit 2, Document No. 28-2, p. 14. She explained that the competitive threat posed by Maple Winds had been obviated by Maple Winds' failure to obtain its medical assistance certification. *Id.*, p. 26. According to McAndrew, the inability of Maple Winds to pose a competitive threat to the

Richland facility effectively rendered Stager's CRR position unnecessary. *Id.* Bartlett, who was deposed on April 4, 2007, also cited the failure of Maple Winds to obtain its certification as the main reason for the elimination of Stager's position. Plaintiff's Exhibit 3, Document No. 28-2, pp. 46-50. Poltrack, George, McAndrew and Bartlett apparently all agreed that the failure of the competitive threat posed by Maple Winds to materialize, coupled with the Richland facility's ability to attract residents without an aggressive marketing campaign, effectively rendered Stager's job unnecessary.

It is undisputed that Stager was not qualified to perform the restorative nursing functions assumed by Shaffer (and later by Gordon) after Stager's departure. At her deposition on January 22, 2007, Stager testified that she had no medical background. Plaintiff's Exhibit 1, Document No. 28-2, p. 2. She acknowledged that she had no qualifications to perform nursing functions. *Id.*, p. 7. Hence, it is clear that Stager was not qualified to fill the position that was created by Beverly after the elimination of her CRR position.

Beverly has satisfied its burden of production. The Court understands Beverly's position to be that Stager's position was eliminated not because its occupant was pregnant, but rather because of Beverly's need to hire someone who could perform *both* admissions functions *and* restorative nursing functions. While Stager could competently handle admissions duties, restorative nursing was simply beyond her area of expertise. By hiring a nurse to fill the new position, Beverly was seeking to lighten Brazil's load by relieving her of the need to perform restorative nursing duties. Poltrack testified that Brazil had been overwhelmed by the combination of her duties as both a restorative nurse and the Assistant Director of Nursing, and that the Richland facility was in need of someone who could assume restorative nursing duties. Plaintiff's Exhibit 4, Document No. 28-3, p. 17. Curry, who was deposed

on January 23, 2007, also testified that the Richland facility needed to hire a restorative nurse. Plaintiff's Exhibit 5, Document No. 28-3, p. 32. Stager, of course, was not capable of working in such a capacity.

The burden now shifts to Stager to point to some evidence, direct or circumstantial, from which a reasonable jury could either (1) disbelieve Beverly's articulated reasons for discharging her or (2) believe that an invidiously discriminatory animus was more likely than not a *motivating* or *determinative* factor in Beverly's termination decision. *Iadimarco v. Runyon*, 190 F.3d 151, 165-166 (3d Cir. 1999). In order to establish liability under Title VII or the PHRA, it is not sufficient for Stager to convince a jury that Beverly's proffered reasons for her discharge are false. Since the ultimate question is whether Beverly engaged in unlawful discrimination, Stager must convince a trier of fact that Beverly's *real reason* for terminating her was a pregnancy-based discriminatory animus. *Reeves*, 530 U.S. at 146-147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105, 119. Nevertheless, Stager need not introduce "additional, independent evidence of discrimination." *Id.* at 149, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 121. It is assumed that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 147, 120 S.Ct. 2097, 2108-2109, 147 L.Ed.2d 105, 120 ; *Furnco Construction Corp.*, 438 U.S. at 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957, 968 ("Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.")(emphasis in original). Therefore, "a plaintiff's prima facie case, combined with sufficient

27

evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120 . Mere speculation about Beverly's motives will not suffice. *Hicks v. Tech Industries*, 512 F.Supp.2d 338, 348 (W.D.Pa. 2007)("Speculation is simply not evidence of discrimination."). As noted earlier, however, Stager may rely on the same evidence used to establish her *prima facie* case for the purpose of discrediting Beverly's proffered reasons for the elimination of her CRR position at the Richland facility. *Doe*, 527 F.3d at 370.

In evaluating Stager's evidence of pretext, the Court is mindful of the fact that a plaintiff in an employment discrimination case is not necessarily required to discount each and every reason proffered by an employer for an adverse employment action in order to defeat a motion for summary judgment. In *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994), the Court of Appeals for the Third Circuit made the following observations:

> We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

*Fuentes*, 32 F.3d at 764, n. 7. Accordingly, the Court's pretext inquiry must account for the evidentiary record as a whole, not just the particular portions of the record relied upon by Beverly to justify its decision to eliminate Stager's CRR position.

Having reviewed the record in detail, the Court is convinced that Stager has sufficiently cast

28

doubt on Beverly's proffered reasons for her discharge in order to enable a reasonable jury to conclude that she was terminated because of her pregnancy rather than because of Beverly's desire to hire someone who could perform restorative nursing duties in addition to admissions duties. There are several reasons why a rational trier of fact may find Beverly's assertions to be unworthy of credence. First of all, Poltrack testified that he had expressed his desire for someone who could perform both admissions and restorative nursing duties *before* Stager was hired as the CRR for the Richland facility. Plaintiff's Exhibit 4, Document No. 28-3, p. 8. At that point, the decisionmakers did not honor his request, opting to hire a CRR instead. *Id.* While Poltrack's testimony may buttress Beverly's explanation for terminating Stager to some extent, it simultaneously serves to undermine that explanation. A reasonable trier of fact may question why Beverly, having ignored Poltrack's request several months earlier, suddenly became responsive to his sentiments a few weeks before Stager was due to give birth.

Beverly's argument is further undermined by the fact that the precise position ultimately crafted to replace Stager's CRR position was not what Beverly personnel had in mind when they made the decision to discharge Stager. The documentary and testimonial evidence contained in the record indicates that Beverly had hoped to replace Stager with a clinical liaison. Bartlett's March 15, 2004, email to Curry discussed the possibility of eliminating Stager's position in order to replace Stager with a "CL" named "Francine."[6] Plaintiff's Exhibit 15, Document No. 28-4, p. 46. The idea of replacing Stager with a clinical liaison was discussed in an email dated as late as April 14, 2004. Plaintiff's

---

[6]The Court will refer to "Francine" by her first name because it is not clear from the record what her last name is.

Exhibit 18, Document No. 28-4, p. 1. Stager was, of course, terminated just two days later. It was not until *after* Stager had already been discharged that Beverly decided to hire someone who could perform both admissions and restorative nursing duties.

McAndrew's testimony concerning Beverly's pursuit of Francine is particularly enlightening. According to McAndrew, Francine was a nurse who had applied for the *same* CRR position for which Stager was ultimately selected. Plaintiff's Exhibit 2, Document No. 28-2, p. 29. McAndrew further testified that one need not be a nurse in order to serve as a clinical liaison. *Id.*, pp. 30. The following colloquy at McAndrew's deposition is directly relevant to this issue:

Q.   Now, this says with regard to the Francine option, replace with CL. Is that clinical liaison?

A.   Correct.

Q.   So that is– So Francine was a clinical liaison?

A.   Francine worked for another company. I don't know what her role was.

Q.   But she was being considered to be a clinical liaison?

A.   That is correct.

Q.   That's not the same position as the position that came after Barb Stager was eliminated. Correct?

A.   Correct.

Q.   So how was Francine going to go into that position, or how was–Excuse me. Strike that. You said she was being considered to fulfill that restorative role. How is that possible when she's being considered for a different position?

A.   The clinical liaison could have covered the marketing plus done the restorative nursing and admissions.

Q. So the clinical liaison is the same position essentially as an admissions director position?

A. No, but you can customize the clinical liaison job to fit the needs of the market and the facility.

Q. What are the duties of a clinical liaison generally?

A. Generally? To do assessments in the hospitals.

Q. Do you have to be a nurse, have a nursing license to do that job?

A. No.

Q. If the clinical liaison job does not require a nursing license, how are you able to customize it to do restorative nursing duties?

A. They would have assigned the restorative nursing duties to the clinical liaison position.

Q. I'm not understanding. You just said you don't need to have a nursing license to do the clinical liaison position. Correct?

A. Correct.

Q. How can you talk about customizing that job into a job--

A. The candidate we were looking to hire for this particular CL position was a nurse. We would have customized that CL position to fit the needs of that facility in that market.

Q. So Francine, you said, had a nursing license?

A. That is correct.

*Id.*, pp. 30-31. One could reasonably view Beverly's actions, as described by McAndrew, as an honest attempt to select a specific candidate to fill a particular role at the Richland facility. At this stage, however, the Court must view the evidence, and all reasonable inferences drawn therefrom, in the light

most favorable to Stager. Viewed in such a light, the evidence could support an inference that Beverly was hoping to hire Francine for the purpose of terminating Stager, rather than seeking to discharge Stager for the purpose of hiring Francine. If Stager's termination (rather than Francine's hiring) was the object of the proposed action, one could reasonably infer that the proposed action was motivated by a discriminatory animus. Since McAndrew acknowledged that she had previously chosen Stager over Francine for the CRR position, a reasonable trier of fact could conclude that Beverly's proffered reason for subsequently seeking to hire Francine (*i.e.*, Francine's nursing skills) is unworthy of credence. Beverly's position is further undermined by the fact that McAndrew, George and Curry continued to discuss replacing Stager with a clinical liaison several weeks *after* Francine had already declined to accept the position. Since they continued to discuss this option after their preferred candidate was no longer available, a reasonable trier of fact could conclude that Beverly had no intention of replacing Stager with a nurse *when* it eliminated her CRR position. After all, what matters is why Beverly *terminated* Stager in April 2004, not why it *hired* Shaffer a few months later.

Beverly contends that the creation of Stager's position had been precipitated by the opening of Maple Winds, which Beverly viewed as a competitive threat to the Richland facility's market share. Nevertheless, at her deposition, Bartlett testified that she did not know whether there were other competitors in the market. Plaintiff's Exhibit 3, Document No. 28-2, p. 41. She did indicate that any such competitors, if they existed, did not put the Richland facility at risk. *Id.* In any event, however, Bartlett's apparent inattention to other potential competitors indicates that the opening of Maple Winds may not have been the only reason for the creation of Stager's CRR position. One would think that an appraisal of Beverly's needs in the Richland market would be more comprehensive than the mere

32

consideration of a single competitor. While it may be true that Maple Winds' failure to obtain its medical assistance certification rendered Stager's CRR position unnecessary, a reasonable jury could conclude otherwise.

The emails presented by Stager clearly cast doubt on Beverly's proffered reasons for eliminating her CRR position. Indeed, the timing of such emails could cause a reasonable jury to conclude that Stager's pregnancy actually motivated Beverly's discharge decision. On March 1, 2004, Stager sent Poltrack and McAndrew an email informing them of her entitlement to a leave of absence under Beverly's internal policies. Plaintiff's Exhibit 11, Document No. 28-4, p. 23. In that email, which was sent at 1:27 P.M., Stager asked whether her job would still be available. *Id.* Just 14 minutes later, at 1:41 P.M., McAndrew forwarded Stager's message to Curry, inquiring as to whether Stager should be asked to sign a document expressing her agreement to return as a 40-hour per week employee. *Id.* Curry apparently never responded to this inquiry. Nevertheless, McAndrew forwarded this same inquiry to Bartlett a few weeks later, shortly after learning that Stager's doctor had recommended that she work no more than four hours per day. *Id.* In a responsive email in which she referred to Stager as "the princess," Bartlett expressed a desire to "nip this." *Id.*

In her deposition, Bartlett testified that she had sought to "nip" McAndrew's efforts to get Stager to sign a document. Defendant's Exhibit 8, Document No. 29-2, p. 3. In some ways, this testimony could be viewed as consistent with her prior acknowledgment, in the same deposition, that she had been aware of no developments that would have required Stager to increase her workweek from 30 to 40 hours. Plaintiff's Exhibit 3, Document No. 28-2, p. 46. Nevertheless, McAndrew's attempt to propose such an increase, when coupled with her earlier comment indicating that she did not expect Stager to

33

return to work after giving birth, could be viewed as an attempt to convince Stager to resign. Her email exchange with Bartlett occurred just hours before Fink confirmed that Beverly could terminate Stager without violating the FMLA, since Stager did not have a statutory entitlement to leave. Plaintiff's Exhibit 32, Document No. 28-5, p. 25. Moreover, Bartlett's reference to Stager as "the princess," when coupled with her subsequent statement that Stager had been "high maintenance," could lead a reasonable jury to conclude that Bartlett was seeking to "nip" something other than McAndrew's attempts to have Stager sign a document. Plaintiff's Exhibit 11, Document No. 28-4, p. 23. Under these circumstances, it cannot be doubted that a reasonable jury could find Beverly's proffered reasons for eliminating Stager's position unworthy of credence. Indeed, the timing of some of these emails could lead a reasonable jury to affirmatively conclude that a pregnancy-based animus was, in fact, a motivating or determinative factor in Beverly's decision. *Iadimarco*, 190 F.3d at 165-166. Hence, each of the reasons articulated by Beverly for the elimination of Stager's position may be viewed by a reasonable trier of fact as nothing more than a *post hoc* fabrication designed to mask an illegal discriminatory discharge. *Doe*, 527 F.3d at 370.

In the employment discrimination context, the Supreme Court has explained that a court faced with a motion for summary judgment must consider the strength of the plaintiff's *prima facie* case, the probative value of the evidence suggesting that the employer's proffered reason for the challenged adverse employment action is false, and any other evidence that may be properly considered in ruling on such a motion. *Reeves*, 530 U.S. at 148-149, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-121. In this case, these factors clearly weigh in favor of a denial of summary judgment. Admittedly, "there is a fine line between evidence that appropriately challenges the employer's proffered reasons as being

34

unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." *Kralman v. Illinois Department of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir. 1994). Nevertheless, the evidence presented in this case, when viewed in the light most favorable to Stager, clearly falls within the former category. Moreover, even a good business decision cannot be made for a discriminatory reason. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706-707 (3d Cir. 2006). Title VII and the PHRA permit employers to make a host of business decisions, good and bad alike, without contravening the requirements of the law. Yet when employers engage in unlawful discriminatory practices, they cannot escape the consequences of their actions merely because such actions may have the incidental effect of yielding legitimate benefits.

Stager is entitled to have her day in court. Nonetheless, it is worth noting that she cannot prevail at trial without establishing that she was terminated because of her *sex* (*i.e.*, because of her *pregnancy*). 42 U.S.C. §§ 2000e(k), 2000e-2(a). This Court has previously discussed, in substantial detail, the standards for establishing a violation of the FMLA. *Lynch v. Robertson*, 2007 WL 2407276, at *21-29 (W.D.Pa. August 20, 2007). Those standards are not controlling in this case, since it is undisputed that Stager did not qualify for leave under the FMLA. The documentary evidence suggests that Stager's requests for leave may have motivated Beverly's decision to eliminate her position. Indeed, the decision to terminate Stager was apparently made shortly after Beverly determined that Stager had no statutory entitlement to leave. The focus of the inquiry in this case, however, is whether she was discharged because of her *pregnancy*, not whether she was discharged because she needed to take a leave of absence. In *Doe*, the Court of Appeals explained:

As earlier noted, Title VII prohibits employment discrimination based on an individual's

sex. 42 U.S.C. § 2000e-2(a). The prohibition is breached "wherever an employee's pregnancy [or related medical condition] is a motivating factor for the employer's adverse employment decision." *In re: Carnegie Ctr. Assoc.*, 129 F.3d 290, 294 (3d Cir. 1997). The PDA does not, however, require preferential treatment for pregnant employees. Instead, it mandates that employers treat pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability to work. *Id.* at 297; see also *Tysinger v. Police Dep't*, 463 F.3d 569, 575 (6th Cir. 2006).

*Doe*, 527 F.3d at 364 (brackets in original).[7] If a nonpregnant, similarly situated employee (i.e., an employee who had no statutory entitlement to leave under the FMLA but who nevertheless needed to take a medical leave of absence) would have been treated in the same manner as Stager, no violation of Title VII or the PHRA can be established in this case.[8] *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312-1314 (11th Cir. 1999). Stager's inclusion within the class of persons protected under the PDA did not entitle her to the FMLA protection that she obviously lacked. Thus, as this case proceeds to trial, the parties should remember two important principles. First, the PDA did not require Beverly to treat Stager (and other pregnant employees) better than other temporarily disabled employees. *Doe*, 527 F.3d at 366. Second, the PDA did require Beverly to treat Stager (and other pregnant employees) "no worse" than other temporarily disabled employees. *Id.* The Court denies Beverly's Motion for

---

[7]The Court of Appeals' use of the term "motivating factor" supports this Court's decision to evaluate Beverly's Motion for Summary Judgment with § 2000e-2(m) in mind. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008)("The prohibition is breached 'wherever an employee's pregnancy [or related medical condition] is a *motivating factor* for the employer's adverse employment decision.'")(emphasis added; brackets in original). Nevertheless, the difference between the *determinative factor* standard and the *motivating factor* standard is not dispositive at this stage, since the Court is convinced that a reasonable jury could conclude that Stager's pregnancy was a determinative factor in Beverly's decision to eliminate her CRR position.

[8]In a letter to Stager's counsel dated May 11, 2004, William J. Kropp, III ("Kropp"), Beverly's Labor and Employment Attorney, indicated that Stager had been terminated because of a "non-work related condition[]." Plaintiff's Exhibit 22, Document No. 28-5, pp. 4-5. Nevertheless, Beverly does not rely on such an argument in support of its Motion for Summary Judgment. Document No. 23, pp. 7-15; Document No. 29, pp. 3-11. This inconsistency is another reason why a reasonable jury may be disinclined to believe Beverly's articulated reasons for eliminating Stager's position.

36

Summary Judgment with this understanding.

## B. The Issue of Mitigation

Beverly argues that it is entitled to summary judgment on the alternative ground that Stager has failed to mitigate any damages caused by her discharge. Document No. 23, pp. 15-20. In making this argument, Beverly vaguely refers to the "statutory duty" of a Title VII plaintiff to mitigate his or her damages. *Id.*, p. 15. Beverly cites 42 U.S.C. § 2000e-5(g)(1), which is the applicable statutory provision, without explaining how the provision actually operates. *Id.* For this reason, the Court must independently examine the applicable statutory language, which provides:

(1) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e-5(g)(1). Beverly's argument concerning Stager's alleged failure to mitigate her damages is based on the last sentence of § 2000e-5(g)(1). By its very terms, the statute provides that amounts which either have been or could have been earned by a plaintiff "shall operate to *reduce* the back pay otherwise allowable." *Id.* (emphasis added). It does *not* preclude all relief available under Title VII merely because a particular plaintiff has failed to mitigate the damages caused by an unlawful employment practice.

37

In *Ford Motor Co. v. Equal Employment Opportunity Commission*, 458 U.S. 219, 102 S.Ct.

3057, 73 L.Ed.2d 721 (1982), the Supreme Court made the following observations about this statutory

provision:

> An unemployed or underemployed claimant, like all other Title VII claimants, is subject
> to the statutory duty to minimize damages set out in § 706(g). This duty, rooted in an
> ancient principle of law, requires the claimant to use reasonable diligence in finding
> other suitable employment. Although the unemployed or underemployed claimant need
> not go into another line of work, accept a demotion, or take a demeaning position, he
> forfeits his right to backpay if he refuses a job substantially equivalent to the one he was
> denied. Consequently, an employer charged with unlawful discrimination often can toll
> the accrual of backpay liability by unconditionally offering the claimant the job he
> sought, and thereby providing him with an opportunity to minimize damages.

*Ford Motor Co.*, 458 U.S. at 231-232, 102 S.Ct. 3057, 3065-3066, 73 L.Ed.2d 721, 732-733(footnoted

omitted). The Supreme Court's discussion about the forfeiture of backpay, when read in context, clearly

refers to the forfeiture of only the *amount* of one's backpay that could have been offset by reasonable

attempts to mitigate damages. This is confirmed by the next sentence in the passage, which makes it

clear that an employer may toll the *accrual* of backpay liability by offering the plaintiff the job that he

or she was previously denied, thereby providing him or her with "an opportunity to *minimize* damages."

*Id.* at 232 (emphasis added).

"Although the statutory duty to mitigate damages is placed on a Title VII plaintiff, the employer

has the burden of proving a failure to mitigate." *Booker v. Taylor Milk Company, Inc.*, 64 F.3d 860,

864 (3d Cir. 1995). Whether a plaintiff has satisfied his or her duty to mitigate damages is a question

of fact. *Id.* Because Beverly moves for summary judgment with respect to an issue on which it bears

the burden of proof, its burden is stringent. *National State Bank v. Federal Reserve Bank*, 979 F.2d

1579, 1582 (3d Cir. 1992). To prevail, Beverly must establish "beyond peradventure" each element necessary to its defense. *Chaplin v. Nationscredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002). In other words, Beverly must make an affirmative showing of the absence of a genuine issue of material fact. *Wasserman v. Bressman*, 327 F.3d 229, 237-238 (3d Cir. 2003); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991). Summary judgment, of course, must still be denied upon a presentation of evidence by Stager demonstrating the existence of a triable issue of fact. *Wasserman*, 327 F.3d at 238.

In order to prevail under § 2000e-5(g)(1)'s "failure to mitigate" defense, an employer must show that: (1) substantially equivalent employment was available to the plaintiff; and (2) the plaintiff did not exercise "reasonable diligence" in attempting to obtain such employment. *Booker*, 64 F.3d at 864. "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990)(internal quotation marks omitted). In some instances, courts have recognized that an employer is relieved of the burden of establishing the existence of substantially equivalent employment when it can show that the plaintiff has made no reasonable effort to find a job. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991). In *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998), the United States Court of Appeals for the Second Circuit explained the rationale for this rule:

> This rule provides an appropriate exception to the usual requirement that the employer prove that suitable work exists *and* that the employee has not made reasonable efforts to find it. The underlying rationale is that an employer should not be saddled by a

39

requirement that *it* show other suitable employment in fact existed–the threat being that if it does not, the employee will be found to have mitigated his damages–when the employee, who is capable of finding replacement work, failed to pursue employment at all.

*Greenway*, 143 F.3d at 54 (emphasis in original). Where a plaintiff has completely failed to seek employment, it can be said that he or she has essentially withdrawn from the workforce. *Holocheck v. Luzerne County Head Start, Inc.*, 2007 WL 954308, at *14-15, 2007 U.S. Dist. LEXIS 22339, at *40-41 (M.D.Pa. March 28, 2007). The Court of Appeals for the Third Circuit has implicitly recognized the existence of this doctrine in an analogous context involving the National Labor Relations Act. *Tubari Ltd., Inc. v. National Labor Relations Board*, 959 F.2d 451, 454 (3d Cir. 1992).

Beverly argues that it is entitled to summary judgment because Stager has failed to exercise "reasonable diligence" in seeking alternative employment. Document No. 23, pp. 16-20. In support of its argument, Beverly contends that Stager has only applied for three jobs since the elimination of her CRR position. *Id.* The record contains evidence that Stager applied for a position with *The Tribune-Democrat*, a newspaper based in the Johnstown area, on April 19, 2004. Stager Deposition Exhibit 15, Document No. 24-4, p. 18. This application postdated her discharge from Beverly by only three days. She also applied for positions with the Ferndale Area School District and the Greater Johnstown Career and Technology Center ("GJCTC") in April 2006. Stager Deposition Exhibits 16 & 17, Document No. 24-4, pp. 19-20. Stager apparently had an interview for the position at the GJCTC. In a letter dated June 30, 2006, Joseph R. Rizzo, Sr. ("Rizzo"), the GJCTC's Acting Temporary Administrative Director, informed Stager that another applicant had been chosen for the

40

position. Stager Deposition Exhibit 18, Document No. 24-4, p. 21. According to Beverly, Stager's sporadic attempts to obtain employment did not constitute "reasonable diligence" within the meaning of § 2000e-5(g)(1). Beverly has presented the expert report of Tina Pish ("Pish"), a vocational case manager, in order to establish that work was available to Stager that was substantially equivalent to the work that she had performed as the CRR at the Richland facility. Defendant's Exhibit 6, Document No. 24-8, pp. 1-8. Stager has filed an affidavit in which she disputes some of the assertions contained in the Pish report. Plaintiff's Exhibit 51, Document No. 28-6, pp. 24-25.

The problem with Beverly's argument is twofold. First, Beverly makes no attempt to differentiate between the various forms of relief available under Title VII, many of which are not subject to § 2000e-5(g)(1)'s duty to mitigate. *Caufield v. Center Area School District*, 133 Fed.Appx. 4, 10 (3d Cir. 2005)("While a finding that Appellant failed to mitigate her damages may limit her recovery of back-pay, and completely bar any claim for forward pay, it has no bearing on whether or not a claim for discrimination can be proven, or on Appellant's ability to receive declaratory and injunctive relief."). Second, Beverly does not identify the *amount* of Stager's damages, if she is entitled to damages, that would be offset by her alleged failure to mitigate. In *Booker v. Taylor Milk Company, Inc.*, 64 F.3d 860, 866-867 (3d Cir. 1995), the Court of Appeals for the Third Circuit expressly rejected the idea that the failure of a plaintiff to mitigate his or her damages somehow operates as a complete bar to an award of backpay. It is undisputed that Stager applied for one position almost immediately after losing her job at Beverly. If Stager effectively withdrew from the workforce by failing to exercise reasonable diligence in seeking alternative employment, it is not clear exactly *when* she did so. Alternatively, if it is assumed that the Pish report is accurate, and that substantially equivalent work was available to

41

Stager, Beverly does not explain *how much* of Stager's damages could have been offset by an attempt to secure such work. Instead, Beverly simply argues that Stager's alleged failure to mitigate her damages warrants the dismissal of all of her claims. Document No. 23, p. 20. This argument is manifestly incorrect. *Booker*, 64 F.3d at 867 ("We conclude that the district court was correct as a matter of law in rejecting Defendant's 'no mitigation-no backpay' argument and in awarding Plaintiff back pay where it was necessary to make him whole."); *Caufield*, 133 Fed.Appx. at \*12 ("Similarly, we cannot agree with the District Court that an appellant's failure to mitigate her monetary losses *ipso facto* bars all monetary relief in the form of back-pay.")(emphasis in original).

The PHRA has also been construed to incorporate a duty on the part of a plaintiff to mitigate damages resulting from an unlawful discriminatory practice. Nevertheless, the PHRA's duty to mitigate is not materially different from that of Title VII. Under the PHRA, an award of backpay "is *reduced* by any amounts [that] the plaintiff actually earned or could have earned through the exercise of reasonable diligence.'" *Clarke v. Whitney*, 975 F.Supp. 754, 758 (E.D.Pa. 1997)(emphasis added), quoting *Gallo v. John Powell Chevrolet, Inc.*, 779 F.Supp. 804, 813 (M.D.Pa. 1991). The PHRA does not preclude the recovery of backpay (or the granting of other forms of relief) merely because of a plaintiff's failure to mitigate damages. *Albert Einstein Medical Center v. Pennsylvania Human Relations Commission*, 486 A.2d 575, 576 (Pa.Commw.Ct. 1985). Consequently, Stager's alleged failure to mitigate the damages caused by the elimination of her CRR position does not entitle Beverly to summary judgment with respect to Stager's PHRA claim.

Stager argues that a reasonable jury could conclude that the jobs identified in the Pish report were not substantially equivalent to her CRR position at the Richland facility, and that there is a genuine

42

issue of material fact as to whether she exercised "reasonable diligence" in seeking alternative employment. Document No. 25, pp. 24-27. These arguments need not be addressed. At this time, the Court expresses no opinion on the merits of Beverly's "failure to mitigate" defense. Beverly remains free to argue, at a later stage, that Stager's right to backpay (if she establishes that she is entitled to backpay) must be reduced because of her failure to mitigate damages. *Tubari Ltd., Inc.*, 959 F.2d at 453 ("After the amount of backpay has been established, the burden shifts to the employer to produce evidence that would mitigate its liability."). Stager remains free to argue that the jobs identified by Pish did not constitute substantially equivalent employment, or that she exercised "reasonable diligence" in seeking employment after her discharge. With respect to the instant Motion for Summary Judgment, it suffices to say that Beverly's "failure to mitigate" argument, even if meritorious as to the issue of damages, has no bearing on the viability of Stager's claims under Title VII and the PHRA. The Court will not embark on an unguided, *sua sponte* examination of the *extent* to which Stager's potential monetary relief may be limited by her failure to exercise "reasonable diligence." Beverly makes no attempt to articulate a benchmark for responsible decisionmaking as to this issue, since it erroneously believes that Stager's alleged failure to mitigate her damages somehow defeats her claims in their entirety. The Court notes that while Stager correctly states that her alleged failure to mitigate is properly characterized as an affirmative defense, she does not specifically argue that it is relevant only to the calculation of backpay under § 2000e-5(g)(1). Document No. 25, pp. 24-27. Nevertheless, the Court must "apply the law as it is, not just as the parties describe it." *McFarland v. Henderson*, 307 F.3d 402, 409 (6th Cir. 2002). While the Court's rationale for denying Beverly's Motion for Summary Judgment with respect to the issue of mitigation differs from that advanced by Stager, it is clear that summary

43

judgment cannot be granted in favor of a defendant pursuant to a theory that has no basis in law. By reserving judgment as to the merits of the "failure to mitigate" issue, the Court leaves the parties free to develop their respective arguments in accordance with the proper framework.

## CONCLUSION

Stager has produced sufficient evidence to establish that her CRR position was eliminated under circumstances giving rise to an inference of pregnancy-based discrimination. Although Beverly has articulated legitimate, nondiscriminatory reasons for its decision to eliminate the position, the evidence produced by Stager has cast sufficient doubt on those reasons to permit a reasonable jury to conclude that a discriminatory animus was a motivating or determinative factor in that decision. Stager is entitled to have her day in court. Moreover, Beverly's alternative basis for seeking summary judgment, which is premised on the erroneous assumption that Stager's alleged failure to mitigate her damages somehow operates as a bar to her claims under Title VII and the PHRA, does not entitle Beverly to the relief that it seeks. Accordingly, the Court must deny Beverly's Motion for Summary Judgment. An appropriate order follows.

44

AND NOW, this 6th day of August, 2008, this matter coming before the Court on Beverly's Motion for Summary Judgment (Document No. 22), IT IS HEREBY ORDERED that Beverly's Motion for Summary Judgment is **DENIED**.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**